# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE | § | |
| COMMISSION, | § | |
|  | § | |
| Plaintiff, | § | |
|  | § | |
| v. | § | CIVIL ACTION NO. H-04-3096 |
|  | § | |
| GARY V. MORRIS, | § | |
|  | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

The Securities and Exchange Commission sued Gary V. Morris, former Chief Financial Officer of Halliburton Company, for violating sections 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2)–(a)(3), and section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), as well as Exchange Act Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240-13a-1, 13a-13, and 12b-2a.  The allegations arise from Halliburton's alleged change in the second quarter of 1998 in its accounting treatment of claims for additional compensation for contracts, without an accompanying disclosure of the change in periodic reports and other public statements.  The SEC alleges that Morris was "responsible" for ensuring that the periodic reports he reviewed and signed and the earnings releases and analyst statements he reviewed were accurate and complied with Generally Accepted Accounting Principles. (Docket Entry No. 1).  Morris moved to dismiss both the section 17(a) and 13(a) claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Docket Entry Nos. 6–7).  The

SEC responded and filed an amended complaint.  (Docket Entry Nos. 14, 15).  Morris then moved to dismiss the amended complaint.  (Docket Entry No. 18–20).  The SEC again responded, (Docket Entry No. 23), and Morris replied.  (Docket Entry No. 25).

Based on the pleadings; the motions, responses, and reply; and the applicable law, this court grants the motion to dismiss the section 13(a) claim; denies the motion to dismiss the section 17(a) claim, and sets a status conference for September 12, 2005, at 8:45 a.m., in Courtroom 11-B.  The reasons for the ruling on the motion to dismiss are set out below.

## I.    Background

Morris served as Halliburton's Chief Financial Officer during 1998 and 1999, the period relevant to the SEC's allegations.  (Docket Entry No. 14, Amended Complaint, ¶ 1). Halliburton's securities are registered under section 12(b) of the Exchange Act and traded on the New York Stock Exchange.  Halliburton offered and sold securities under registration statements filed in June 1998 and October 1998 and a supplement filed in November 1998. In the amended complaint, the SEC alleges that as CFO, Morris signed these registration statements — Forms S-8 and S-3 — on Halliburton's behalf.  (*Id.*, ¶ 10–11).  Morris also "reviewed, edited, and signed" the periodic reports Halliburton filed annually (Form 10-K) and quarterly (Form 10-Q).  (*Id.*, ¶ 25).  Morris also "directed others to prepare Halliburton's earnings releases and analyst teleconference scripts, which he reviewed."  (*Id.*, ¶ 26).  The SEC alleges that because "[e]ach of Halliburton's registration statements incorporated future filings of the company. . . Halliburton's material misleading statements and omissions were made in the offer or sale" of securities.  (*Id.*, ¶ 11).

The basis for the SEC's complaint is an accounting change it alleges Halliburton adopted in the second quarter of 1998.  The change affected Brown and Root Energy Services (BRES), a business unit of the Energy Services Group, one of Halliburton's two primary reporting segments.[1]  The accounting issue is when to recognize as revenues claims for additional compensation on construction contracts.  The SEC alleges that from at least 1993 through the first quarter of 1998, Halliburton had recognized claims for additional compensation on contracts "during the period such claims are resolved."  The SEC alleges that Halliburton stated that it followed this approach in its annual Form 10-K reports.  In the second quarter of 1998, however, Halliburton began recognizing as revenue claims for additional contract compensation arising from cost overruns that Halliburton had not resolved with its customers.  The SEC alleges that Halliburton did not report this accounting change until March 2000, in its 1999 Form 10-K.  The SEC alleges that the failure to disclose this change for eighteen months, over six reporting periods, made the periodic reports and other public statements issued during those periods materially misleading.

In mid-1997, Brown & Root began several large engineering, procurement, and construction (EPC) projects, that incurred large cost overruns.  (*Id.*, ¶¶ 12–14).  The SEC alleges that in the second quarter of 1998, Halliburton changed its accounting treatment:

> by offsetting cost overruns on the BRES EPC contracts with estimated recoveries on claims that had not been resolved with customers.  Although permitted under Generally Accepted Accounting Principles ("GAAP") in appropriate circumstances,

---

[1]  The other reporting unit is the Engineering & Construction Group.

> this practice deviated from Halliburton's longstanding conservative practice of recognizing income only from resolved claims. As a result of the accounting change, losses from cost overruns on several EPC contracts in the BRES business unit were reduced or eliminated.

(*Id.*, ¶¶ 16–17). The SEC also alleges Halliburton omitted from its 1998 Form 10-K the claims recognition statement that had appeared in previous Forms 10-K, but did not explain the change.[2]  (*Id.*, ¶ 21).

The SEC does not allege that Halliburton violated GAAP or the securities laws in the change in accounting treatment. Rather, the SEC alleges that the failure to disclose the change, which increased reported income and made quarter-to-quarter income comparisons between 1997 and 1998 more favorable, violated GAAP and the SEC's Regulation S-X and made the public reports materially misleading.[3]  According to the amended complaint, Morris

---

[2]   The SEC alleges that Halliburton compounded the problem by "incorporating by reference" its historical claims recognition practice statement in its Forms 10-Q filings for the second and third quarters of 1998. (*Id.*, ¶ 22).

[3]   The SEC alleges that the increases in pretax income attributable to the accounting change ranged from a high of approximately $87 million reported in the 1998 Form 10-K (a 46 percent increase from $191 million to the reported $279 million) to $36 million in the third quarter of 1998 (when Halliburton reported a loss of $610 million, but omitting the unapproved claims would have increased the loss by 5.7 percent to $646 million). The amended complaint sets out the comparisons alleged to be misleading. In the second quarter of 1998, Halliburton's reported pretax income of $229 million would have been $184 million without including revenues from unresolved claims for additional compensation, a difference of $45 million or 24.8 percent. In the first quarter of 1999, Halliburton reported pretax income of $149 million, but without including the unresolved claims for additional compensation in the revenue amount, its income would have been $130 million, a difference of $19 million or 14.8 percent. In the second quarter of 1999, Halliburton reported pretax income of $146 million, but without the unresolved claims for additional compensation, its income would have been $136 million, a difference of $10 million, or 7.5 percent. In the third quarter of 1999, Halliburton reported a pretax income of $103 million, while its income without the additional compensation claimed but not yet resolved with its customers would have been $92 million, a difference of about $11 million, or 11. 6 percent. (Docket Entry No. 14, p. 5).

knew of Halliburton's accounting change and its impact on Halliburton's income, but "failed to ensure that Halliburton disclosed the accounting change and its impact on Halliburton's income."  Morris also "failed to ensure" that Halliburton did not incorporate by reference its former claims recognition policy in the second and third quarter Forms 10-Q, when that policy was no longer in effect.  (*Id.*, ¶ 23).  As a result, the SEC asserts that Morris is responsible for a material misrepresentation that the second and third quarter 1998 Forms 10-Q, the 1998 Form 10-K, and the 1999 Forms 10-Q, were prepared in accordance with GAAP and Commission Regulation S-X, which allegedly required disclosure of the accounting change.  (*Id.*, ¶ 25).

The SEC also alleges that Morris is responsible for his failure to correct materially misleading information in earnings releases and analyst teleconference scripts that he reviewed in the second and third quarters of 1998.  Morris allegedly attended the teleconferences as Halliburton's president "read aloud the misleading information in the scripts regarding the company's income.  Morris never cautioned the president about the misleading statements."  (*Id.*, ¶ 26).  Finally, the SEC's complaint lists the specific misleading statements in each periodic filing, earnings release, and analyst teleconference over the relevant six quarters.  (*Id.*, ¶¶ 27–43).

The SEC asserts two claims against Morris.  First, Morris violated sections 17(a)(2) and 17(a)(3) of the Securities Act by making untrue statements of material facts or omissions of material facts necessary in order to make the statements made not misleading in the offer or sale of securities.  (*Id.*, ¶¶ 46–49).  The SEC alleges that Morris negligently engaged in

this conduct.  Second, the SEC alleges that Morris aided and abetted Halliburton's violations

of section 13(a) of the Exchange Act and related rules, by knowingly providing substantial

assistance to Halliburton in filing materially misleading annual and quarterly reports.  (*Id.*,

¶¶ 50–53).  The SEC seeks a permanent injunction and a civil money penalty.

Morris has moved to dismiss the SEC's amended complaint.[4]  The first issue is

whether Morris is subject to liability under section 17(a) of the Securities Act in the absence

of allegations that he either owned or directly and actively participated in offering or selling

Halliburton securities.  The second issue is whether the SEC has alleged facts that, if proven,

could meet the scienter requirements of aiding and abetting liability under section 13(a).

Morris also claims that the disclosures at issue were not misleading as a matter of law.

(Docket Entry No. 19, at 21).  Morris argues that what the SEC characterizes as a change in

accounting policy or principle was instead the application of an accepted accounting rule to

certain "qualifying contracts."   Morris argues that the change in accounting treatment

corresponds to a change in the type of contract Brown & Root used, moving from "cost-plus"

construction contracts to "fixed-fee" projects, rather than a change in accounting principle

that would require disclosure.  Under GAAP, Halliburton was permitted to recognize as

revenues unresolved claims against customers for cost overruns on fixed-fee contracts when

---

[4] The SEC also filed civil enforcement actions against Halliburton and its controller, Robert Muchmore, Jr., containing substantially identical allegations.  Both defendants settled and entered agreed final judgments.  Without admitting or denying the complaint's allegations, Halliburton paid a $7.5 million civil penalty and Muchmore paid a $50,000 penalty.  *SEC v. Halliburton Co.*, No. 04-CV-3097 (S.D. Tex. Aug. 25, 2004) (Atlas, J.).  The same defendants also consented to cease and desist orders barring future violations of Securities Act Section 17(a) and Exchange Act Section 13(a) and related rules.  *In re Halliburton Co.*, 2004 WL 1737425, at *1 (Aug. 3, 2004).

it was "probable that the claim will result in additional contract revenue" and the "amount can be reliably estimated." American Institute of Certified Public Accountants' Statement of Position 81-1(.65). Morris emphasizes that the recognition of revenue was proper under GAAP and that the SEC has never claimed that Halliburton had to restate its revenues. Morris challenges the SEC's assertion that there was a change in accounting principle under GAAP or that any change in accounting treatment was material so as to require disclosure.

## II.     The Legal Standard for a Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) dismissal is appropriate only if there is no set of facts that could be proven consistent with the complaint allegations that would entitle the plaintiff to relief. *Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). The court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Id.* In order to avoid dismissal, however, a court need not "accept as true conclusory allegations or unwarranted deductions of fact." *Id.* (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with one important exception. In *Collins*, 224 F.3d at 498–99, the Fifth Circuit approved the district court's consideration of documents the defendant attached to a motion to dismiss. In *Collins* and later in *Scanlan*, the Fifth Circuit made it clear that "such consideration is limited to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." 343 F.3d at 536, citing *Collins,* 224 F.3d at 498–99.

Other courts approve the same practice, stating that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993); *see also Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1998); *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994).

## III.   The Claim Under Section 17(a) of the Securities Act

In his motion to dismiss the amended complaint, Morris argues that he was neither an "offeror" nor a "seller" under section 17(a) of the Securities Act, which states in part:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> > (1) to employ any device, scheme, or artifice to defraud, or
> >
> > (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> >
> > (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C.A. § 77q(a) (West 2005).  Morris argues that the § does not allege facts that, if proven, would show that he was involved in "the offer or sale" of Halliburton securities because the amended complaint does not allege that he either owned the securities offered for sale or sold or directly and actively participated in their offer or sale.  (Docket Entry

No. 19, at 11).  Morris points to the Securities Act's definition of "offer" and "sale" in section 2(a)(3) for support:  "The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value.  The term 'offer to sell', 'offer for sale', or 'offer' shall include every attempt to offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value."  15 U.S.C. § 77b(a)(3).  Acknowledging that "few courts have interpreted the terms 'offer' and 'sale' in the context of § 17(a)," Morris argues that the Fifth Circuit's decision in *Meadows v. §*, 119 F.3d 1219, 1225 n.9 (5th Cir. 1997), "confirmed" that these words are interpreted consistently under section 12 and section 17 of the Securities Act.  Morris cites several cases holding that one is not a buyer or seller of a security under section 12 unless one directly and actively participates in soliciting a sale and is motivated in part by a desire to serve personal interests or those of the securities owner.  *See Meadows*, 119 F.3d at 1225; *Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261, 12169 (D. Utah 2002); *VT Investors v. R&D Funding Corp.*, 733 F. Supp. 823, 839 (D.N.J. 1990).

The question is whether the consonant definitions of "offer" and "sale" in sections 12 and 17 also restrict liability for section 17 claims to the same individuals and entities who could be found liable under section 12.  In *Meadows*, the Fifth Circuit expressly avoided this "interpretive issue."  119 F.3d at 1224 ("The Division disputes Meadow's interpretation of § 17(a), arguing that § 17(a) encompasses more than just 'offerors' or 'sellers' because it applies to 'any person *in* the offer or sale of any security (emphasis added).  We need not resolve this interpretive issue.").  The *Meadows* court noted that its own research found no

case on point, but "recognize[d] the Supreme Court has stated that the language of § 17(a) 'does not require that the fraud occur in any particular phase of the selling transaction,' and 'that '[t]he statutory terms [offer and sale] . . . are expansive enough to encompass the entire selling process, including the seller/agent transaction.'" *Id.* at 1224 n.8 (alterations in original) (*citing United States v. Naftalin*, 441 U.S. 768, 773, 99 S. Ct. 2077, 2081, 60 L. Ed. 2d 624 (1979)).

The statutes imposing liability under sections 12 and 17 are not identical. Section 12(2) of the Securities Act, 15 U.S.C. § 77l(2), states:

> "Any person who —
>
> (2) offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . shall be liable . . . to the person purchasing such security from him. . . .

15 U.S.C.A. § 77l(2) (West 2005). Liability attaches to "any person" who "offers or sells a security." By contrast, in section 17, liability attaches to "any person in the offer or sale of any securities." That section states:

> It shall be unlawful for any person in the offer or sale of any securities . . . (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C.A. § 77q(a) (West 2005).

The SEC cites several cases in which individuals who make, create, or assist in the preparation or dissemination of material misrepresentations or omissions in the offer or sale of securities are subjected to liability under section 17(a). *See SEC v. First Jersey Secs. Inc.*, 101 F.3d 1050, 1467 (2d Cir. 1996); *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 862 (S.D.N.Y. 1997); *SEC v. Whitworth Energy Res. Ltd.*, 2000 U.S. App. Lexis 31237, at *6 (9th Cir. Dec. 1, 2000) (affirming partial summary judgment against individual and corporate defendants for failing to disclose source of investor distributions); *SEC v. Buntrock*, 2004 WL 1179423, at *10 (N.D. Ill. May 25, 2004) (denying corporate officers' motion to dismiss control person liability claim under § 17(a)).  In several of these cases, courts found section 17(a) liability without analyzing the extent to which the defendants were involved in the offer or sale of securities and whether they would benefit from the offer or sale.  In *Softpoint,* 958 F. Supp. at 846, a district court granted summary judgment against a former officer and director of a corporation for violating, among other things, section 17(a) of the Securities Act.  The former officer, Stoeckline, prepared and disseminated press releases, periodic SEC reports, and registration statements. Stoeckline also received Softpoint stock as compensation, which he sold through his codefendant company, and received the proceeds from the sale of Softpoint stock that had been issued to another codefendant.  *Id.* at 852.  The court held that because Stoeckline had signed public filings containing material misrepresentations and participated in schemes to inflate his company's income through unlawful stock sales, his "activities fall unmistakably within the broad scope of conduct prohibited by Sections 17(a) and 10(b) and

11

Rule 10b-5." *Id.* at 862.

In *SEC v. Whitworth Energy Resources,* an unpublished decision, the Ninth Circuit upheld a district court's grant of summary judgment against three individuals and three corporate defendants for violating section 17(a).  2000 U.S. App. Lexis. 31237, at *1.  The defendants operated an oil and gas syndication business.  Two of the corporate entities, owned and controlled by two individual defendants, raised several million dollars from investors in securities offerings.  All three individual defendants "shared duties in drafting, selecting and reviewing the offering materials" for the public offering.  The defendants "violated securities law when they failed to disclose the source of their distributions to investors" and failed to disclose a related entity's debt.  Citing section 17(a), with other sections of the Securities Act, the court stated that "liability arises where offering materials to prospective investors contain materially false or misleading statements, including omissions of material facts."  *Id.* at *7.

Morris notes that in most of these cases, the defendants participated in offering or selling securities to a greater degree than "merely signing public filings," which he asserts is the extent of the SEC's allegations as to his role in the asserted misrepresentations.  (Docket Entry No. 19, p. 14).  Morris both understates the SEC's allegations as to his involvement and overstates the conclusions that can be gleaned from the sparse case law on the subject.

The SEC does not merely allege that Morris "signed" periodic public reports and registration statements incorporating those public reports.  The SEC alleges that Morris

reviewed and edited these reports before signing them, with knowledge of the change in the accounting treatment as to when to recognize unresolved claims from contract cost overruns as revenue, and with knowledge of the impact of that change on earnings.  As to the cases under section 17(a), they do not specifically hold that a defendant must either own the security offered or sold or actively participate in the offer or sale.  To the contrary, most of the cases do not analyze the defendants' degree of involvement in selling or offering securities.  *See, e.g., Softpoint*, 958 F. Supp. at 862 (noting that signing public filings, preparing and disseminating press releases and reports "fall unmistakably within the broad scope" of 17(a) and other antifraud provisions); *Whitworth*, 2000 U.S. App. Lexis, at *6 ("Defendants violated securities laws when they failed to disclose the source for their distributions to investors and Condor's claimed debt.  Under section 17(a) [and other antifraud provisions], liability arises where offering materials to prospective investors contain materially false or misleading statements, including omission of material facts.").

Morris identifies one case from outside the jurisdiction that appears to limit section 17(a) to defendants directly and actively involved in selling or offering securities for sale. In *Buford White Lumber Co. Profit Sharing and Savings Plan & Trust v. Octagon Properties, Ltd.*, 740 F. Supp. 1553, 1569 (W.D. Okla. 1989), a private plaintiff who had purchased securities sued a law firm that had prepared prospectuses and offering circulars on behalf of a client for the sale of those securities.  The plaintiff alleged that the documents contained false and misleading statements that violated  sections 12 and 17(a) and other antifraud provisions.  The court granted the defendant law firm's motion to dismiss the section 17(a)

claim, finding that "no private cause of action lies for violations of section 17(a)." *Id.* at 1568.  The court then added that, alternatively, "section 17(a), as Defendant notes, applies to those who offer or sell securities. . . . Plaintiffs have failed to allege facts showing that the Defendant was an offeror or seller for purposes of section 17(a)." *Id.* at 1569–70.

The *Buford* court did not analyze the statutory language of section 17(a).  As noted, that section attaches liability to "any person in the offer or sale of any securities," while section 12 applies to "[a]ny person who — (2) offers or sells a security."  The court did not distinguish between the two sections.  The *Buford* case is also distinguishable in that the defendant was a law firm whose involvement in selling securities was limited to preparing offering materials for the issuer.  Morris, as alleged in the amended complaint, served as chief financial officer for the entity offering its own securities for sale, and Morris signed the SEC reports and registration statements accompanying those offerings.

Although little case law exists on this precise question, the Supreme Court's unanimous decision in *Naftalin* interpreted section 17(a) expansively.  *See* 441 U.S. at 778 ("Unlike much of the rest of the [Securities] Act, [section 17(a)] was intended to cover any fraudulent scheme in an offer or sale or securities, whether in the course of an initial distribution or in the course of ordinary market trading."); *id.* at 773 ("The statutory terms, which Congress expressly intended to define broadly, are expansive enough to encompass the entire selling process, including the seller/agent transaction.") (citations omitted).  In *Meadows*, the Fifth Circuit interpreted section 17(a) broadly, consistent with the only Supreme Court guidance available.  *See Meadows*, 119 F.3d at 1224 n.8; *see also Gustafson*

*v. Alloyd Co., Inc.*, 513 U.S. 561, 573, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995) (approving of and relying on *Naftalin*'s broad interpretation of section 17(a)).  In denying defendant's motion to dismiss, this court follows the direction provided by *Naftalin* and *Meadows*.

The motion to dismiss based on the argument that Morris is not a person alleged to have violated the statute "in the offer or sale of a security" is denied.

## IV.    The Claim Under Section 13(a) of the Exchange Act

The SEC alleges that Halliburton violated section 13(a) of the Exchange Act, 15 U.S.C.A. § 78m(a) (West 2005), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. § 240.12b-20, 240.13a-1, and 240.13a-13, by filing materially misleading financial reports, and that Morris knowingly aided and abetted Halliburton's violations.  To establish aider and abettor liability for securities violations, the plaintiff must show that: (1) a primary violator committed a securities violation; (2) the alleged aider and abettor had a general awareness of his role in the violation; and (3) the aider and abettor knowingly rendered substantial assistance in furtherance of it.  *See Abbott v. Equity Group, Inc.*, 2 F.3d 613, 621 (5th Cir. 1993).

Morris argues that the SEC's amended complaint does not allege facts that, if proven, would support an inference that Morris knowingly aided and abetted Halliburton's alleged section 13 and rules violations. Morris argues that Fifth Circuit authority interprets the "knowingly" requirement to require "both 'general awareness that [the defendant's] role was part of an overall activity that is improper' and *knowing* assistance in the violation." (Docket Entry No. 19, p. 16) (emphasis and alterations in original).  The SEC responds that Morris

seeks "to superimpose on the plain language of section 20(e) an additional requirement that

Morris knew his actions were improper and that he knew of his assistance in the violation."[5]

The Fifth Circuit addressed the scienter requirement for aiding and abetting securities

violations in *Woodward v. Metro Bank of Dallas*, stating as follows:

> Without meaning to set forth an inflexible definition of aiding
> and abetting, we find that a person may be held as an aider and
> abettor only if some other party has committed a securities law
> violation, if the accused party had general awareness that his
> role was part of an overall activity that is improper, and if the
> accused aider-abettor knowingly and substantially assisted the
> violation.

522 F.2d 84, 94 (5th Cir. 1975) (*quoting SEC v. Coffey*, 493 F.2d 1304 (6th Cir. 1974)).  In

*Woodward*, the court stated that it would "assume . . . the existence of a securities act

violation" by the primary violator, and then determine the second element, whether an

alleged aider and abetter had "general awareness that one's role was part of an overall

activity that is improper."  *Id.* at 95.  In analyzing this second element, "the surrounding

circumstances and expectations of the parties are critical.  If the alleged aider and abettor

conducts what appears to be a transaction in the ordinary course of his business, more

---

[5] Section 20(e), "Prosecution of persons who aid and abet violations," states:

> For purposes of any action brought by the Commission under
> paragraph (1) or (3) of Section 78u(d) of this title, any person that
> knowingly provides substantial assistance to another person in
> violation of a provision of this chapter, or of any rule or regulation
> issued under this chapter, shall be deemed to be in violation of such
> provision to the same extent as the person to whom such assistance
> is provided.

15 U.S.C.A. 78t(e) (West 2005).

evidence of his complicity is essential." *Id.* For the third element, knowing and substantial assistance, the *Woodward* court blended approaches from two other circuits:

> When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high "conscious intent" variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter. In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b-5 liability without clear proof of intent to violate the Securities laws.

*Id.* at 97 (citations and footnotes omitted); *see also Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1126 (5th Cir. 1988)*, vacated on other grounds sub nom Fryar v. Abell*, 492 U.S. 914 (1989).

The SEC "disagrees that the knowledge standard articulated in *Woodward* and *Howard* are consistent with the plain language of Section 20(e)" and argues that "the allegations in [the] Amended Complaint clearly meet the 'knowledge' standard advocated by Morris." (Docket Entry No. 23, p. 21). The SEC understates the legal standard for knowledge under section 13(a) and overstates what it alleged in the amended complaint.

The case law supports Morris's argument that *Woodward* is still applicable law. To state a claim for aiding and abetting, the plaintiff must allege facts that, if true, demonstrate: (1) a securities violation by a primary party; (2) that the aider and abettor had a general awareness of its role in the violation; and (3) that the aider and abettor knowingly rendered substantial assistance in that violation. *Abell,* 858 F.2d at 1126. "General awareness means

knowledge which, though it may be adduced from reckless conduct, means actual awareness. . . . [H]ow 'knowing' an abettor must be depends upon how substantial the abettor's assistance is."  *Id.*  As the Fifth Circuit stated:

> Underlying the other two elements — "general awareness" and "knowing substantial assistance" — is a single scienter requirement that varies on a sliding scale from "recklessness" to "conscious intent."  The plaintiff must show conscious intent, unless there is some special duty of disclosure, or evidence that the assistance to the violator was unusual in character and degree.  In the latter two instances, a recklessness standard applies.

*Abbott*, 2 F.3d at 621 (citations and footnotes omitted); *see also Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004); *Southwest Realty Ltd. v. Daseke*, 1992 WL 373166, at *11 (N.D. Tex. May 21, 1992) (stating that *Woodward* "divided the scienter requirement into two parts:  knowledge of one's role in a fraud and commitment (or intent) to aid in the fraud's success").  A plaintiff can state a claim for aiding and abetting securities fraud by showing "severe" or "extreme" recklessness, but that requires allegations that the alleged aider and abettor "encountered 'red flags' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct of the primary violators."  *See Howard*, 376 F.3d at 1143; *see also Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001) (finding company president and CEO's "severe recklessness" provided the scienter necessary to prove securities fraud under Rule 10b-5).

The SEC's amended complaint states that "Morris, acting alone or in concert or others, in the manner set forth above, knowingly provided substantial assistance to

Halliburton in its violations. . . ."  (Docket Entry No. 14, ¶ 53).  The SEC argues that the

following facts demonstrate that Morris had a general awareness that his conduct was part

of an overall activity that was improper:

> (1) "Morris was CFO and a licensed CPA who reviewed, signed
> and was responsible for the public filings of a prominent NYSE-
> traded company"; (2) "Morris knew that in 1998 the company
> implemented an accounting change that enhanced pre-tax
> income by as much as 46.1%"; (3) "Morris knew that
> Halliburton disclosed its accounting for unapproved claims in
> prior annual reports, omitted any disclosure relating to the
> accounting of unapproved claims  in its 1998 Annual Report,
> and disclosed a new standard in its 1999 Annual Report which
> Morris knew was adopted during the previous fiscal year"; (4)
> "Morris violated multiple GAAP provision by failing to inform
> the investing public of the accounting change"; (6) "When
> Morris finally decided to disclose the change, it was
> misleading".

(Docket Entry No. 23, pp. 21–22).  None of these allegations concern or establish Morris's

knowledge of wrongdoing.  *See Woodward*, 522 F.2d at 97 (stating "the degree of knowledge

required should depend on how ordinary the assisting activity is in the business involved").

Instead, the SEC's allegations relate to ordinary business activities, without specifying facts

that would show Morris's knowledge of participation in improper activity.  *See id.* (stating

"[i]f the evidence shows no more than transactions constituting the daily grist of the mill, we

would be loathe to find [aiding and abetting] liability without clear proof of intent to violate

the securities laws.").

Although the SEC also argues that the allegations would, if proven, establish that

Morris was reckless, it points to neither "red flags" or "suspicious events" that should have

put Morris on notice of Halliburton's improper conduct.  *See, e.g., SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708 (D.N.J. 2005).  In *Lucent*, the SEC alleged that the defendant corporation fraudulently and improperly recognized revenue and pre-tax income in violation of GAAP during fiscal year 2000.  *Id.* at 711.  That year, Lucent and its customer, AT&T Wireless Services (AWS) began to negotiate a new pricing regime that priced its equipment sales to AWS differently.  The companies did not implement the new pricing until August 2000, several months after the new regime's anticipated April 2000 implementation date. One Lucent executive, Carter, authorized his subordinates to enter into an oral agreement with their AWS counterparts that the new pricing structure would apply retroactively to all products purchased after April 1, 2000.  *Id.*  During this interim period, Lucent provided equipment valued at $53 million to AWS that had not been invoiced, and sought to recognize revenue from the sale.  AWS provided a purchase order priced under the old regime, with the express understanding that Lucent would provide a credit for that invoiced amount and AWS would ultimately pay only the price calculated under the new pricing structure.  The SEC alleged that Lucent's recognition of revenue and operating income in the amount of $53 million violated GAAP and that individual officers aided and abetted Lucent's violations of Securities Act section 10(b), Exchange Act sections 13(a) & (b), and associated SEC rules. An individual defendant officer, Hayes-Bullock, moved to dismiss three counts of aiding and abetting Lucent's securities law violations, arguing that the SEC had failed to plead any allegations that would support either an inference that she knew or was reckless in not knowing that Lucent's revenue recognition violated GAAP.  The SEC alleged that Hayes-

Bullock knew of the oral side agreement, was responsible for ensuring that all transactions were GAAP-compliant, and personally drafted letters to the chief accountant that were misleading as to the side agreement's existence. *Id.* at 725. Because the SEC failed to allege when Hayes-Bullock knew of the alleged side agreement, the court dismissed the claim, stating that "the timing of this disclosure is critical because if [Hayes-Bullock] were not made aware of the side agreement until after the revenue was recognized, this allegation would be irrelevant." *Id.* The court dismissed the aiding and abetting claims against this defendant.[6]  In this case, as in *Lucent*, the SEC has alleged no facts showing that the defendant knew or was severely reckless in not knowing of his participation in a fraudulent scheme.

Morris's motion to dismiss the SEC's aiding and abetting claim is granted.  Because the SEC has already amended and does not argue that, if allowed to amend, it would be able

---

[6]  The *Lucent* court also analyzed whether the SEC had properly stated the third aiding and abetting element — that Hayes-Bullock knowingly provided substantial assistance.  Because the complaint alleged that she was responsible for ensuring that Lucent's financial statements complied with GAAP,

> [t]he Court can infer from this allegation that part of Hayes-Bullock's job entailed reviewing each transaction, including the transaction at issue here, to ensure that it was accounted for in accordance with GAAP, and that Hayes-Bullock was familiar with GAAP.  The Court cannot think of a better example of substantially assisting another to commit fraud than exists here.  If Hayes-Bullock knew of the side agreement, signed-off on the revenue recognition anyway in violation of GAAP, and then assisted in drafting letters to the Chief accountant that suggested that there was no side agreement, this would satisfy the "substantial assistance" element of an aiding and abetting claim.

*Id.* at 726.

to plead additional facts showing that Morris had the requisite knowledge, the dismissal is with prejudice.

## V.     The Claim That There Is No Underlying Violation by Halliburton

Morris moves to dismiss on the basis that as a matter of law, Halliburton's disclosures were not misleading because: (1) GAAP did not require Halliburton to disclose its accounting judgment as to when claims against customers for contract cost overruns are recognized as revenues; and (2) Halliburton had no duty to qualify its disclosures of true information about its accounting and finances.  The SEC alleged in its amended complaint that Morris was responsible for the material misrepresentation that certain periodic reports were prepared in accordance with GAAP and Regulation S-X.[7]  Specifically, the SEC points "without limitation" to disclosure requirements contained in Statement of Position (SOP) 81-1(.65) of the American Institute of Certified Public Accountants; Accounting Principles Board Opinion ("APB") No. 20; and Rules 4-01(a)(1), 10-01(a)(5), and 10-01(b)(6) of Regulation S-X. Morris argues that the SEC bases its entire amended complaint on GAAP violations, specifically APB 20, because the Regulation S-X rule violations all "depend on whether the Company failed to comply with GAAP."  (Docket Entry No. 19, p. 2 n.24).

Morris attached APB 20 to his motion to dismiss the amended complaint.  (Docket Entry No. 20. att. 1).  Morris argues that its accounting change does not require disclosure. According to APB 20:

---

[7]   Regulation S-X is the Commission's regulation that, the SEC argues, required the disclosure of Halliburton's accounting change.

> A characteristic of a change in accounting principle is that it concerns a choice from among two or more generally accepted accounting principles.  However, neither (a) initial adoption of an accounting principle in recognition of events or transactions occurring for the first time or that previously were immaterial in effect nor (b) adoption or modification of an accounting principle necessitated by transactions or events that are clearly different in substance from those previously occurring is a change in accounting principle.

3 Original Pronouncements: Accounting Standards APB Opinion No. 20, ¶ 8 (Financial Accounting Standards Board 2002/2003).  Morris contends that the "SEC cannot meet either standard" because Halliburton clearly disclosed that it was "using estimating procedures as permitted under GAAP and, as the record will reflect, no such change in accounting principle occurred at all under APB 20." (Docket Entry No. 19, p. 9).  Morris argues that "[s]ince APB 20 is the only GAAP provision that Halliburton allegedly violated, the SEC must prove that a change in accounting principle occurred to show that Halliburton's disclosures were misleading." (*Id.*, p. 21).  According to Morris, no change in accounting principle occurred because Halliburton "adopted the use of SOP 81-1 to account for transactions that were previously immaterial in their effect and clearly differed in substance from their predecessors."[8]  Morris argues that the SEC's amended complaint points out that BRES entered into fixed-price EPC contracts during the relevant period.  (Docket Entry No. 14,

---

[8]  SOP 81-1 is entitled "Accounting for Performance of Construction-Type and Certain Production-Type Contracts." (Docket Entry No. 20, att. 2).  This statement of position contains the FASB's guidance on GAAP for these type of contracts.  The SEC acknowledges that Halliburton's alleged accounting change is "permitted under [GAAP] in appropriate circumstances," but argues that Halliburton's decision that "deviated" from its "longstanding conservative practice of recognizing income only from resolved claims" had to be disclosed to avoid  misrepresentation. (Docket Entry No. 14, ¶ 16).

¶¶ 12–13).

The SEC complaint does not allege that BRES entered fixed-price EPC contracts for the first time in mid-1997.  The amended complaint alleges that during the "relevant period BRES conducted a substantial portion of its business" using these contracts and that by mid-1997, BRES had "commenced several large fixed-fee" EPC projects.  (*Id.*).  At this motion to dismiss stage, this court cannot conclude that, as a matter of law, the accounting treatment for the claims for additional compensation from contracts "were previously immaterial in their effect and clearly different in substance from their predecessors."

Morris argues that even if Halliburton had a duty to disclose its use of SOP 81-1, "there is no legal basis justifying the SEC's claims that the disclosure should have included more than a statement that the change had been made."  (Docket Entry No. 19, p. 22).  For example, the SEC's amended complaint alleges that Halliburton's second quarter 1998 Form 10-Q did not disclose that without the accounting change, its reported income 24 percent increase in operating income would have in fact decreased 4.5 percent.  (Docket Entry No. 14, ¶ 27).  The SEC responds that Rule 12b-20 under the Exchange Act requires public companies to include in public reports "such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."  17 C.F.R. § 240.12b-20.  Regulation S-X states in part:

> The interim financial information shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading. . . . [D]isclosure shall be provided where events subsequent to the end of the most recent fiscal year

have occurred which have a material impact on the registrant. Disclosures should encompass for example, significant changes since the end of the most recently completed fiscal year in such items as: accounting principles and practices. . . .

17 C.F.R. § 210.10-01(a)(5).   Regulation S-X also states:

> [T]he registrant shall state the date of any material accounting change and the reasons for making it.  In addition, for filings on Form 10-Q and Form 10-QSB, a letter from the registrant's independent accountant shall be filed as an exhibit . . . in the first Form 10-Q and Form 10-QSB subsequent to the date of an accounting change indicating whether or not the change is to an alternative principle which in his judgment is preferable under the circumstances; except that no letter from the accountant need be filed when the change is made in response to a standard adopted by the Financial Accounting Standards Board which requires such change.

17 C.F.R. § 210.10-01(b)(6).   The SEC alleges that because investors did not know that Halliburton had changed its "historic accounting policy," the company's quarter-to-quarter comparisons were materially misleading and violated section 17(a), Rule 12b-20, and Regulation S-X.   According to the SEC, the accounting principles on which Halliburton relied also require disclosure of accounting changes.   APB 20 states that "[t]he nature and justification for a change in accounting principle and its effect on income should be disclosed in the financial statement of the period in which the change is made.  The justification for the change should explain clearly why the newly adopted accounting principle is preferable." (Docket Entry No. 23, att. A (APB No. 20) n.17).   Similarly, SOP 81-1, which applies to accounting of construction contracts, states that amounts of unapproved claims "if material, should be disclosed in the notes to the financial statements."  (Docket Entry No. 20, att. 2

(SOP 81-1 (.65)).

Compliance with GAAP is a fact-specific issue. *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 298 (5th Cir. 1990); *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) ("assuming that consistency with GAAP is enough to preclude liability, it is a factual question whether BCF's accounting practices were consistent with GAAP"); *SEC v. Caserta*, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999). Neither compliance with GAAP nor the materiality of omitted disclosures can be resolved on a motion to dismiss. Morris's motion to dismiss on the grounds that GAAP did not require Halliburton to disclose its change in accounting treatment and that any failure to disclose was immaterial is denied, without prejudice to reasserting these arguments as the basis for a motion for summary judgment.

## IV.    Conclusion and Order

Morris's motion to dismiss is granted as to the aiding and abetting claim under section 13(a) and denied as to the negligence claim under section 17(a). A status conference is set for **September 12, 2005, at 8:45 a.m.**, in Courtroom 11-B.

SIGNED on August 18, 2005, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge