**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § | |
| Plaintiff, | § § | |
| v. | § | CIVIL ACTION NO. H-04-3096 |
| GARY V. MORRIS, | § § § § | |
| Defendant. | § | |

**MEMORANDUM OPINION ON DISMISSAL**

After years of investigation and litigation, this case boiled down to the absence of a footnote in the Halliburton Company's 1998 Form 10-K filed on March 23, 1999 and in the Form 10-Qs filed in the second and third quarters of 1998 and the first three quarters of 1999. The Securities and Exchange Commission alleged that Gary V. Morris, the Chief Financial Officer of the Halliburton Company from 1998 to 2000, committed fraud and was negligent in approving these financial filings without a footnote disclosing the amounts of unapproved claims for additional compensation for fixed-fee construction contracts for one division, Brown and Root Energy Services (BRES). The S.E.C. did not allege impropriety in the underlying accounting. Indeed, the S.E.C. stipulated that Halliburton complied with Generally Accepted Accounting Standards in recognizing the unapproved claims as revenue. No restatement was required.

The S.E.C. acknowledged in a hearing held on February 12, 2007 that this case was unusual because it alleged fraud and negligence in the disclosures accompanying financial statements when the statements themselves fully complied with accounting requirements. This court previously dismissed the S.E.C.'s allegation that Morris committed fraud in failing to ensure that the 1998 and 1999 Form 10-Qs and the 1998 Form 10-K and related public statements disclosed the unapproved claim amounts included in the BRES revenues. The remaining allegation is that Morris was negligent under sections 17(a)(2) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2)–(a)(3).

Morris moved for summary judgment dismissing the negligence claim. In the February 12, 2007 hearing, the S.E.C. withdrew part of the evidentiary basis it had asserted to support its claim, the opinion of its expert witness as to negligence. The S.E.C. also withdrew part of the legal basis it had asserted to support its negligence claim. The S.E.C. was left with a negligence claim based on the American Institute of Certified Public Accountants' Statement of Position (SOP) 81-1(.65), which states that the amounts of unapproved claims recognized as revenue should be disclosed in notes to financial statements if "material,"and on the Accounting Principles Board (APB) Opinion No. 22, which states that a description of "significant" accounting policies should be included in financial statements. On February 23, 2007, the S.E.C. moved to dismiss the remaining negligence claim, with prejudice, in the "interest of justice." (Docket Entry No. 64). This memorandum opinion grants the motion to dismiss this case, making it clear that as a matter of law, Morris was neither fraudulent nor negligent as the S.E.C. alleged.

The parties stipulated to much of the evidence. Morris "reviewed, approved and signed" Halliburton's Forms 10-Q and 10-K filed with the S.E.C. in 1998 and 1999. During this period, Charles Muchmore served as Halliburton's Controller and Chief Accounting Officer and David Clark served as BRES's controller. Morris and Muchmore oversaw an internal accounting staff of over 2,000 individuals.

Footnote 1 to the 1997 Form 10-K, issued on March 18, 1998, was entitled "Significant Accounting Policies." The paragraph headed "Revenues and Income Recognition" included the statement that "[c]laims for additional compensation are recognized during the period such claims are resolved." SOP 81-1(.65) allows recognition of additional contract revenue relating to unapproved claims "if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated." The evidence shows that in the first quarter of 1997, Halliburton recognized some unapproved claims for additional compensation as revenue, but the amounts were neither significant nor material. The undisputed evidence also shows that Halliburton did not have unapproved claims for additional compensation to recognize as revenue in the second, third, and fourth quarters of 1997 or the first quarter of 1998.

In mid-1997, BRES entered into several large fixed-fee engineering, procurement, and construction contracts. One of these contracts, the Obaiyed project, involved constructing a gas production plant in Egypt. Two other projects were part of a joint venture to construct pipelines in Brazil and Bolivia. As these projects progressed, they encountered cost overruns. At the end of the second quarter of 1998, BRES began to recognize as revenue claims for

additional compensation for these projects based on the customers' liabilities for cost overruns associated with their failure to fulfill contractual obligations to BRES.  The decision to recognize the unapproved claim revenue under SOP 81.1(.65) was based on the conclusion that it was probable that the claims would be paid and the amounts could be reliably estimated.  Morris testified that Halliburton's accounting staff, the BRES staff, and Arthur Andersen investigated the use of  SOP 81.1(.65) to recognize the unapproved claims for additional compensation for the construction projects as revenue.  Morris testified that he was informed that "if they did not accrue that revenue . . . they would be misstating the project results."  (Morris Deposition, Docket Entry No. 56, Ex. S, p. 28).

    Morris testified that he understood that if the unapproved claims were material, disclosure was required.  (Morris Deposition, Docket Entry No. 56, Ex. S, p. 40).  Morris knew that it was routine practice for Muchmore's staff to determine whether transactions of significance were material and required further action or disclosure.  (*Id*. at 62).  Morris also knew that part of Arthur Andersen's standard quarterly process would involve examining the materiality of the revenues recognized under SOP 81-1(.65).  (*Id*. at 64).   Both Morris and Muchmore testified that they did not believe that including unapproved claims for additional compensation as revenue was material until the last quarter of 1999, when the amount of such claims had increased significantly and the income of the entire company—not merely BRES—had decreased significantly.  (Deposition of Charles Muchmore, Docket Entry No.

4

Case 4:04-cv-03096   Document 65   Filed in TXSD on 02/26/07   Page 5 of 9

57, Ex. A, p. 101; Deposition of Gary Morris, Docket Entry No. 56, Ex. S, pp. 66–68). At that point, the amount of the accrued revenue for unapproved claims for additional compensation was disclosed, consistent with GAAP.

The S.E.C. criticized Morris for not being more direct and thorough in questioning Muchmore and others about whether the materiality analysis had been performed beginning in the second quarter of 1998, when the unapproved claims for additional compensation on the large fixed-fee contracts were first recognized. The uncontroverted evidence showed that Morris knew that a materiality analysis would be performed. Based on his own knowledge and experience and his review of the company's financial statements, Morris believed that additional disclosure was not required.

As noted, the S.E.C. did not contend that GAAP required different accounting treatment of the unapproved claim revenue. The S.E.C. agreed that Halliburton used appropriate accounting in recognizing the unapproved claims as revenue. The S.E.C. alleged that the failure to disclose the amounts of unapproved claims recognized as revenue was a material misrepresentation and that Morris was negligent in allowing the financial reports and related public statements to issue without containing this information.

"Materiality is determined by evaluating whether there is '[a] substantial likelihood that' the false or misleading statement 'would have been viewed by the reasonable investor as having altered the 'total mix' of information made available.' Put another way, '[a] statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *ABC*

*Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 359 (5th Cir. 2002) (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 418 (5th Cir. 2001)). Negligence is not a strict liability standard. Negligence in this context requires the absence of a reasonable basis. *See Weiss v. SEC*, 468 F.3d 849, 855 (D.C. Cir. 2006); *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 854 (9th Cir. 2001).

The S.E.C. relied on two principal arguments to support its claim that Morris was negligent: the reported income amounts were significantly higher with the unapproved claims included than they would have been without those claims, and quarter-to-quarter income comparisons were difficult because of the change in accounting for unapproved claims. Neither argument withstands analysis.

The first argument states the obvious point that including unapproved claims for additional compensation in the quarterly and annual reports for a particular business segment increased the reported income for that segment. That effect does not equate to a finding of materiality. Accounting principles allow recognition of unapproved claims for additional compensation if and when it is probable that the claims will be paid and the amounts can be reliably estimated. The S.E.C. agrees that Halliburton used proper accounting in including the unapproved compensation claims as revenue in each of the financial reports at issue. That is, the S.E.C. agrees that the risk of nonpayment was low enough to allow the unapproved claims to be recognized as revenue under SOP 81-1(.65). Disclosing the amounts of unapproved claims is a disclosure of the risk of nonpayment that such claims present. (Deposition of Charles Muchmore, Docket Entry No. 56, Ex T, p. 71). The S.E.C.'s

arguments in response to Morris's motion for summary judgment did not address a key issue as to both materiality and negligence: whether it was reasonable to conclude that the risk of nonpayment of the unapproved claims for additional compensation, considered with the other aspects of the company's financial condition, was not material and did not have to be disclosed.

The S.E.C.'s second argument, that an investor could not make quarter-by-quarter comparisons because Halliburton did not accrue unapproved claims for additional compensation as revenue for most of 1997 but did after the second quarter of 1998 through 1999, is not supported by the record. The S.E.C. argues that an investor would have found quarter-to-quarter comparisons difficult because in 1997 and the first quarter of 1998, unapproved claims were not included in income under SOP 81.1(65) (except for some clearly immaterial amounts in early 1997), but in the last three quarters of 1998 and the first three quarters of 1999, unapproved claims were included. The problem with this argument is the evidence showing that if Halliburton had used the same accounting treatment in 1997 and the first quarter of 1998 that it used in the rest of 1998 and 1999, there would have been no difference in Halliburton's reported performance for 1997 and early 1998. The record shows that in the last three quarters of 1997 and the first quarter of 1998, Halliburton did not have unapproved claims for additional compensation that it could have accrued as income. Quarter-by-quarter comparisons were not affected by the company's use of SOP 81.1(65) in 1998 and 1999.

The S.E.C. correctly points to some inaccuracies in the financial statements.

7

Halliburton included a statement in a footnote in the 1997 annual report stating that it was not including unapproved compensation claims in accrued income. This footnote statement was not followed in the first quarter of 1997, although the amounts involved were relatively small and the S.E.C. did not base any claim for relief in this case on the financial reports for that quarter. This footnote statement was incorporated by reference in the second and third quarters of 1998, when Halliburton was in fact applying SOP 81.1(65) and accruing unapproved claims as income. The 1998 annual report deleted the footnote statement because the inconsistency was detected. Halliburton had incorrectly included some claims for additional compensation related to joint ventures in receivables rather than in investments and equity, Halliburton corrected the number one year but did not go back to correct the comparable number for the prior year. Morris does not dispute these errors. But the test for culpability is not whether a mistake occurred; the test is whether a mistake was material and negligently made.

Given the undisputed evidence as to the relative amounts of unapproved claims included in the BRES income reports for the last three quarters of 1998 and the first three quarters of 1999, the other categories of income recognized, the amounts of income reported for Halliburton as a whole, and the testimony as to the nature and extent of the accounting reviews and the propriety of the accounting treatment, there is no basis for a jury to conclude that it was negligent for Morris to rely on and accept the conclusion that the amounts of unapproved claims for additional compensation included in BRES's reported income for the quarters at issue did not require specific disclosure in a footnote to Halliburton's financial

statements. Dismissal with prejudice is appropriate, based on the S.E.C.'s motion to dismiss and the granting of Morris's motion seeking summary judgment that, as a matter of law, he did not act fraudulently or negligently as the S.E.C. alleged.

SIGNED on February 26, 2007, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge